**UNITED STATES DISTRICT COURT**       **EASTERN DISTRICT OF TEXAS**

UNITED STATES OF AMERICA      §
                              §
*versus*                      §      CASE NO. 4:13-CR-215
                              §
JOSHUA MARK FORD              §

**MEMORANDUM AND ORDER**

Pending before the court is Defendant Joshua Mark Ford's ("Ford") Motion for Reduction in Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (#146), wherein he requests compassionate release due to medical circumstances based on his debilitated medical condition and also because the sentencing law has changed since he was sentenced, resulting in the elimination of a "stacking provision" for firearms offenses. The Government filed a response in opposition (#152), and Ford replied (#155). United States Probation and Pretrial Services ("Probation") conducted an investigation and recommends that the court deny Ford's motion. Having considered the motion, the submissions of the parties, Probation's recommendation, the Government's response, the record, and the applicable law, the court is of the opinion that the motion should be DENIED.

I.    Background

On November 23, 2012, in Plano, Texas, a police officer initiated a traffic stop on Ford's vehicle because it was swerving and almost hit another vehicle. Ford and his passenger appeared to be under the influence of narcotics. In Ford's pocket, the officer discovered a plastic bag, the contents of which tested positive for methamphetamine. The officer also located prescription pills on the passenger. Following a search of Ford's vehicle, the following items were discovered: 6.17 grams of methamphetamine; 2,150 grams of GHB; 7.71 grams of amphetamine; 66 dihydrocodeinone pills; 11 alprazolam pills; 7 diazepam pills; 31 methandienone pills; 7.73 grams

of testosterone cypionate, testosterone enanthate, and testosterone propionate (liquid form); 5.51 grams of testosterone enanthate and testosterone propionate (liquid form); multiple syringes and glass containers containing liquid and white powdery substances; several bags of marijuana (amount unknown); 23 loadable gift cards; an iPad; a Samsung laptop computer; a loaded Glock, Model 26, a 9mm caliber semi-automatic pistol; and a loaded AMT, Model Back Up, .38 caliber semi-automatic pistol.  Ford and his passenger were arrested.

On June 26, 2013, under the direction of narcotics officers, an informant contacted Ford to purchase two gallons of GHB for $2,000.00 at an apartment complex in Dallas, Texas.  Once Ford arrived and backed into a parking space, officers in unmarked cars with flashing lights positioned their vehicles to block Ford's vehicle from exiting.  Ford refused to follow the officers' orders and intentionally rammed his vehicle into the officers' vehicles in an effort to flee.  At the same time, officers approaching Ford's vehicle on foot broke the dark-tinted windows of his vehicle in an effort to arrest him.  As officers attempted to grab Ford through the broken window, he crawled into the back seat, pulled a firearm from the waistband of his pants, and pointed it at an officer.  The officer fired his weapon and shot Ford in the leg.  When Ford's firearm was removed, the hammer was found to be cocked and the firearm ready to fire.  Ford's wallet, which was also retrieved at the scene, contained a driver's license with Ford's photograph but bearing a different name, as well as a receipt for the purchase of a firearm using the false identity on the license.  A search of Ford's vehicle and person yielded:  25.12 grams of methamphetamine; 14,870 grams of GHB; 1.85 grams of methylone; 2.51 grams of alprazolam; 0.41 gram of dimethyltryptamine; 3.19 grams of cocaine; 0.67 gram of ketamine and methoxeramine; 7.66 grams of testosterone enanthate (liquid form); 3.48 grams of testosterone cypionate, testosterone

decanoate, testosterone enanthate, testosterone isocaproate, testosterone phenylpropionate, and testosterone propionate (liquid form); 2.89 grams of testosterone cypionate, testosterone enanthate, and testosterone propionate (liquid form); 11.24 grams of testosterone cypionate (liquid form); a Smith & Wesson, .38 caliber revolver; a Sig Sauer, .40 caliber semi-automatic pistol; 1 box .40 caliber ammunition; and 4 cell phones.

On June 11, 2015, the United States Grand Jury for the Eastern District of Texas returned an eight-count Third Superseding Indictment charging Ford in Count 1 with Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1); in Count 2 with Possession with Intent to Distribute Gamma Hydroxybutrate ("GHB"), in violation of 21 U.S.C. § 841(a)(1); in Count 3 with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); in Count 4 with Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1); in Count 5 with Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1); in Count 6 with Possession with Intent to Distribute GHB, in violation of 21 U.S.C. § 841(a)(1); in Count 7 with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c); and in Count 8 with Felon in Possession of a Firearm, in violation of a 18 U.S.C. § 922(g)(1).[1]

Following a four-day trial, a jury found Ford guilty of all eight counts of the Third Superseding Indictment.  The jury also found Ford responsible for 31.29 grams of methamphetamine and 17,020 grams of GHB.  On May 18, 2016, the court sentenced Ford to 475 months' imprisonment, followed by a five-year term of supervised release.  The term consists of

---

[1] Counts 1 through 4 concern the events that occurred on November 23, 2012, while Counts 5 through 8 cover the events that occurred on June 26, 2013.

115 months total on Counts 1, 2, 4, 5, 6, and 8, to be served concurrently; 60 months on Count 3, to be served consecutively to all other terms; and 300 months on Count 7, to be served consecutively to all other terms.  His conviction was upheld on appeal.  After serving a term of imprisonment imposed in state court, Ford was transferred to federal custody in March 2019. Ford is currently housed at the Medical Center for Federal Prisoners in Springfield, Missouri ("MCFP Springfield"), an administrative security federal medical center, with a projected release date of January 9, 2053.

II.    Analysis

On December 21, 2018, the President signed the First Step Act of 2018 into law.  *See* First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194.  The Act, in part, amended 18 U.S.C. § 3582(c), which gives the court discretion, in certain circumstances, to reduce a defendant's term of imprisonment:

> The court, upon motion of the Director of the Bureau of Prisons ("BOP"), or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that extraordinary and compelling reasons warrant such a reduction; or the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [BOP] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).  This provision is commonly referred to as "compassionate release."

Prior to the First Step Act, only the Director of the BOP could file a motion seeking compassionate release. *See Tuozzo v. Shartle*, No. 13-4897, 2014 WL 806450, at *2 (D.N.J. Feb. 27, 2014) (denying petitioner's motion for compassionate release because no motion for his release was filed by the BOP); *Slate v. United States*, No. 5:09-CV-00064, 2009 WL 1073640, at *3 (S.D.W.Va. Apr. 21, 2009) ("Absent a motion from the BOP, the Court lacks authority to grant compassionate release."). The First Step Act amended § 3582(c) by providing a defendant the means to appeal the BOP's decision not to file a motion for compassionate release on the defendant's behalf. *United States v. Cantu*, 423 F. Supp. 3d 345, 347 (S.D. Tex. 2019); *United States v. Bell*, No. 3:93-CR-302-M, 2019 WL 1531859, at *1 (N.D. Tex. Apr. 9, 2019). The plain language of the statute, however, makes it clear that the court may not grant a defendant's motion for compassionate release unless the defendant has complied with the administrative exhaustion requirement. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 833 (6th Cir. 2020) ("Even though [the] exhaustion requirement does not implicate [the court's] subject-matter jurisdiction, it remains a mandatory condition."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he exhaustion requirement . . . presents a glaring roadblock foreclosing compassionate release."). Thus, before seeking relief from the court, a defendant must first submit a request to the warden of his facility to move for compassionate release on his behalf and then either exhaust his administrative remedies or wait for the lapse of 30 days after the warden received the request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Harris*, No. 20-1723, 2020 WL 4048690, at *1 (3d Cir. July 20, 2020); *United States v. Springer*, No. 20-5000, 2020 WL 3989451, at *3 (10th Cir. July 15, 2020) (defendant "was required to request that the BOP file a compassionate-release motion on his behalf to initiate his administrative remedies" (citing

*Raia*, 954 F.3d at 595)); *Alam*, 960 F.3d at 833-34; *United States v. Soliz*, No. 2:16-190-3, 2020 WL 2500127, at *3 (S.D. Tex. May 14, 2020) ("§ 3582(c)(1)(A) does not provide this Court with the equitable authority to excuse [defendant's] failure to exhaust his administrative remedies or to waive the 30-day waiting period." (quoting *United States v. Reeves*, No. 18-00294, 2020 WL 1816496, at *2 (W.D. La. Apr. 9, 2020))).

A.    <u>Medical Condition</u>

Ford submitted a request for compassionate release to the warden of his facility based on his medical condition on March 18, 2019.  On June 20, 2019, the warden denied Ford's request, noting that although Ford has "a serious medical condition and require[s] some level of assistance, the review of [his] request revealed [he is] in a substantially similar condition as [he was] at the time of [his] sentencing."[2]  Moreover, the warden notes that, at that time, Ford had only served approximately 3 months of his 475-month sentence.  Although Ford appears to have complied with the exhaustion requirement before filing the present motion, a careful assessment of his motion, his medical records, the nature and circumstance of his offense of conviction, his criminal history, his disciplinary records, and his history of substance abuse reveals that compassionate release is not warranted at this time.

Congress did not define "extraordinary and compelling."  Rather, it elected to delegate its authority to the United States Sentencing Commission ("the Commission").  *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be

---

[2] A memorandum for the warden from the Reduction in Sentence Committee, dated June 11, 2019, notes that Ford suffered a left hip fracture in 2017, which was expected to be resolved with surgery.  BOP medical staff and outside medical consultants have since deemed his left hip fracture to be inoperable.

considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 (U.S. SENTENCING COMM'N 2018) ("USSG").  In Application Note 1 to § 1B1.13 of the USSG, the Commission defined "extraordinary and compelling reasons" to include the following four categories of circumstances:  (i) certain medical conditions of the defendant; (ii) the defendant is 65 years or older and meets other requirements; (iii) the defendant's family has specified needs for a caregiver; and (iv) other reasons in the defendant's case that establish an extraordinary and compelling reason.  The court must also consider the factors set forth in 18 U.S.C. § 3553(a),[3] as applicable, and find that the sentence modification is consistent with the policy statements issued by the Commission.  18 U.S.C § 3582(c)(1)(A).  The policy statement regarding compassionate release requires a determination that "the defendant is not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  The USSG provides that extraordinary and compelling reasons exist regarding a defendant's medical condition when the defendant is "suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory)" or when a defendant is "suffering from a serious physical or medical condition," "suffering from a serious functional or cognitive impairment," or "experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes

---

[3] Section 3553(a) directs courts to consider:  the nature and circumstances of the offense and the defendant's history and characteristics; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need to deter criminal conduct; the need to protect the public; the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences and sentencing ranges established for defendants with similar characteristics under applicable USSG provisions and policy statements; any pertinent policy statement of the Commission in effect on the date of sentencing; the need to avoid unwarranted disparities among similar defendants; and the need to provide restitution to the victim.  18 U.S.C. § 3553(a).

the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

Ford, who is 43 years old, contends that he has several serious medical conditions which, in concert, substantially diminish his ability to provide self-care. According to his Presentence Investigation Report ("PSR"), prepared in the spring of 2016, Ford "is in poor physical health," specifically:

> The defendant reported having renal failure in 2006 due to an unintentional drug overdose. . . . During the instant offense the defendant was shot multiple times in the leg. As a result, on July 12, 2013, he had a right hip disarticulation at Medical Center of Plano. . . . The defendant has a rod in his left leg due to being shot. The defendant does not have a full range of motion in that leg and complained about constant pain and discomfort in the left leg. Other medical conditions include: speech impairment, memory loss, strokes, tracheostomy, and bed sores. As a result of the strokes, the defendant speaks in a whisper and has poor handwriting.

Ford maintains that, after he was sentenced in the instant case, he suffered a left hip fracture while serving a sentence in state prison, which has left him without the use of his left leg. Ford further contends that the BOP medical staff has declared his hip fracture to be inoperable, which, when combined with his previous leg amputation, likely means he will be indefinitely confined to a wheelchair. Additionally, Ford asserts that he can no longer perform many activities of daily living without substantial assistance from others, as he is unable to dress his lower body or shower independently. Ford also claims that he suffers from incontinence, requiring multiple diaper changes throughout the day. Ford's medical records confirm that, as a result of his right leg amputation and left hip fracture, he is wheelchair-bound and receives daily assistance with showering, oral care, and diaper care. BOP has classified him as a Care Level 4 inmate.

The Government notes, however, that prior to trial, between November 20, 2014, and December 19, 2014, Ford underwent a psychological evaluation at the Federal Medical Center in Fort Worth, Texas.  Although Ford appeared to have difficulty enunciating words with clarity and normal tone during interviews and responded to the evaluator by "writing and/or two to three word answers," the inmate care assistants and nursing staff indicated that Ford was "able to communicate in full sentences when encouraged to do so."  Moreover, during that time, Ford communicated with his mother regularly by telephone.  At the conclusion of his psychological evaluation, Ford was diagnosed with vascular neurocognitive disorder resulting from possible hypoxic brain stemming from his 2006 drug overdose, depressive disorder due to cerebrovascular ischemia, and alcohol, cannabis, amphetamine, and opioid use disorders.  In 2019, Ford was referred to a speech therapist to address his mild cognitive, voice and speech production deficits, and swallowing dysfunction post-stroke.  In November 2019, due to improvements, Ford was discharged from speech therapy with instructions to continue home program tasks and exercises.  Indeed, Ford indicates in his motion for sentence reduction that he speaks with his mother every day.  An administrative note dated July 29, 2020, relates, "Patient makes regular contact with his family and friends through multiple calls per week."  In addition, Ford has been sanctioned for phone abuse while in federal custody.

Ford contends that his serious medical conditions are further compounded by his significant weight loss from 159.0 pounds on December 5, 2019, to 128.7 pounds on March 10, 2020.  While this is a significant decrease in weight, on July 27, 2020, Ford's weight had increased to 141.0 pounds, and his registered dietician notes that he has made "excellent strides in his weight gain," and that further weight gain is not advised.  A medical record dated July 29, 2020, confirms that

Ford weighs 141 pounds, is 67 inches in height, and has a Body Mass Index of 22, which is considered normal.

Considering the severity of Ford's health issues, he likely meets the medical criteria for compassionate release.  Nevertheless, although Ford's medical conditions appear to be serious, "compassionate release is discretionary, not mandatory," and can be denied after considering the factors set forth in 18 U.S.C. § 3553(a).  *United States v. Chambliss*, 948 F.3d 691, 693 (5th Cir. 2020).  In light of the 3553(a) factors, the court finds that granting Ford compassionate release would be inappropriate.  In connection with his offense of conviction, Ford had 2 firearms and ammunition, along with myriad narcotics, in his vehicle upon his arrival at an apartment complex in June 2013, where he had agreed to sell 2 gallons of GHB to a confidential informant.  He was previously found to be in possession of 3 firearms, ammunition, and a variety of narcotics in his vehicle in November 2012.  Ford's sentence also included an enhancement for obstruction of justice resulting from his ramming a vehicle into a police car, grabbing a firearm from his waistband, and pointing it at an officer in an attempt to avoid arrest.  Ford committed his offense of conviction while on parole.  Hence, Ford has "clearly disregard[ed] all respect for the law." *Id.* at 694.  Ford has an extensive criminal history, including prior convictions for possession of marijuana, driving while intoxicated, unlawfully carrying a weapon, unlawful possession with intent to deliver a controlled substance (GHB), unauthorized use of a motor vehicle, and possession of a controlled substance (oxycodone).  He also has a long history of poly-substance abuse dating from age 7, and he was a daily user of methamphetamine, hallucinogens (LSD, PCP, GHB), and hydrocodone at the time of his arrest in 2013.  In addition, Ford has had three disciplinary infractions while in federal custody, including phone abuse, refusing a drug/alcohol

test, and misusing authorized medication and possessing unauthorized item stemming from his buying medication from another inmate.

The Government points out that Ford's medical records from his incarceration at MCFP Springfield reflect that he continues to demonstrate drug-seeking behavior and manipulation.  In records from 2019-2020, Ford's physician, Dr. S. Moose, observes that Ford appears to be faking, or at least grossly exaggerating, his pain in order to obtain narcotics, and notes repeatedly that Ford consistently exhibits a FLACC score of zero.[4]  On July 18, 2019, Dr. Moose cut off Ford's over-the-counter medication from commissary because he was purchasing 50 tablets each week of 200mg dose Motrin in addition to the Motrin 800mg that he was already receiving, which put him at risk for gastro-intestinal bleeding, renal damage, and possible overdose.  Recently, in July 2020, Dr. Moose discontinued Ford's narcotic pain medication because he showed no change in his subjective or objective ratings of pain with the medication.  On July 9, 2020, Dr. Moose related, "I have spoken to NP (nurse practitioner) and nurses on his unit this week to confirm that with and without pain meds, he never has any signs of pain, even when pulling himself onto left hi[p] in shower."  He adds, even if left hip non-union "causes pain with movement at times, chronic narcotics would not be indicated."  A pharmacy note prepared on July 29, 2020, by Landon Sams, PharmD, reports that Ford uses apap (acetaminophen), capsaicin cream, and baclofen for pain but notes that he "frequently refuses pill line 5."  In any event, Ford continues to be prescribed baclofen and capsaicin cream and also takes acetaminophen for pain management.

---

[4] The FLACC (Face, Legs, Activity, Cry, Consolability) pain scale is a measurement used to assess pain in children and individuals who are unable to communicate their pain.  Ford's medical records from March 2019 through July 2020 reflect only one entry from Dr. Moose stating that Ford exhibited a FLACC score other than zero; specifically, "First time ever I have seen other than FLACC score zero. When he arrived in Geri-chair he grimaced as he shifted his position."

Thus, considering the above factors, the court cannot conclude that Ford would not pose a danger to the safety of any other person or to the community, if released from prison.

Moreover, granting Ford compassionate release would fail to provide just punishment for his offense and promote respect for the law.  In *Chambliss*, the United States Court of Appeals for the Fifth Circuit found that the district court did not abuse its discretion in denying compassionate release to a defendant due to the defendant's not yet having served a significant portion of his sentence.  *Id.*  The district court determined that the defendant's terminal illness "constitut[ed] 'an extraordinary and compelling reason for a sentence reduction' and that he '[did] not present a danger upon release,'" but denied release because "releasing [the defendant] after serving only 14 years of a 30-year sentence minimizes both the impact of [the defendant's] crime and seriousness of the offense."  *Id.* at 693-94.  "Moreover, the [district] court, citing the § 3553(a) factors, determined that requiring [the defendant] to serve the remainder of his sentence would 'provide just punishment for the offense' and 'afford adequate deterrence to criminal conduct.'"  *Id.*  In the instant case, releasing Ford after he has served only 1½ years of his 39-year sentence would similarly minimize the impact of his crime and the seriousness of his offense.

Additionally, it is unclear whether Ford would have access to adequate medical treatment as well as personal needs care if he is released, as he has requested, to the home of his mother, who is in her 70s and retired.  Despite Ford's struggle to provide self-care, Probation reports, and Ford's medical records indicate, that his medical and personal care needs are being met by a variety of providers at the federal medical center.  Regarding Ford's history of drug abuse, courts are precluded from "lengthening a prison term in order to promote a criminal defendant's rehabilitation," but in the present case, the court is deciding whether to reduce, not extend, a

12

sentence. *Tapia v. United States*, 564 U.S. 319, 321 (2011); *see Chambliss,* 948 F.3d at 694. Here, Ford has a history of abusing methamphetamine, opioids, marijuana, and alcohol. Furthermore, Ford's medical and disciplinary records reflect that he has demonstrated drug-seeking behavior and manipulation while incarcerated.  Therefore, releasing Ford may facilitate his drug abuse, as he would gain unfettered access to over-the-counter medications and illegal drugs outside the BOP.  Clearly, his mother has not prevented him from committing a series of criminal offenses or from using a variety of drugs, including powder and crack cocaine, heroin, LSD, PCP, GHB, and hydrocodone from the age 7, while residing in her home, which is listed as Ford's address in his PSR.

B.     Stacking of Firearms Offenses

Ford's request that the court consider whether the removal of the "stacking" provision of 18 U.S.C. § 924(c)(1) qualifies as an extraordinary and compelling reason, potentially falls into the fourth, catch-all category of "other" extraordinary and compelling reasons, which specifically states that the Director of the BOP shall determine whether "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 cmt. n.1(D).  Although Subdivision D is reserved to the BOP Director, the Commission acknowledged, even before the passage of the First Step Act, that courts are in the position to determine whether extraordinary and compelling circumstances are present.  *United States v. Beck*, 425 F. Supp. 3d 573, 583 (M.D.N.C. 2019) ("Read in light of the First Step Act, it is consistent with the previous policy statement and with the Commission guidance more generally for courts to exercise similar discretion as that previously reserved to the BOP Director in evaluating motions by defendants for compassionate

13

release."); *see Cantu*, 423 F. Supp. 3d at 352 ("[T]he correct interpretation of § 3582(c)(1)(A)

. . . is that when a defendant brings a motion for a sentence reduction under the amended

provision, the Court can determine whether any extraordinary and compelling reasons other than

those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)-(C) warrant granting relief.").

Section 924(c)(1) punishes individuals who knowingly possess a firearm in furtherance of

a crime of violence or a drug trafficking crime.  18 U.S.C. § 924(c); *United States v. Johnson*,

943 F.3d 214, 222 (5th Cir. 2019); *United States v. Suarez*, 879 F.3d 626, 632 (5th Cir. 2018),

*cert. denied*, 140 S. Ct. 279 (2019).   The statute mandates the imposition of a five-year,

consecutive sentence upon a person who uses or carries a firearm in furtherance of such a crime.

*See* 18 U.S.C. § 924(c)(1)(A)(i); *Suarez*, 879 F.3d at 632.  A person who brandishes or discharges

a firearm in connection with such a crime is subject to a consecutive term of imprisonment of

seven or ten years, respectively.  *See* 18 U.S.C. § 924(c)(1)(A)(ii)-(iii).

The version of 18 U.S.C. § 924(c)(1)(C) in effect prior to the First Step Act imposed a

25-year mandatory minimum term of imprisonment "[i]n the case of a second or subsequent

conviction under [§ 924(c)]."   Under this provision, also known as the "stacking" provision,

multiple § 924 violations charged concurrently triggered the enhanced mandatory minimum.  *See*

*United States v. Davis*, ___ U.S. ___, 139 S. Ct. 2319, 2324 n.1 (2019) (citing *Deal v. United*

*States*, 508 U.S. 129, 132-35 (1993)).  As of December 21, 2018, the First Step Act amended

§ 924(c)(1)(C) to apply only "[i]n the case of a violation of [§ 924(c)] that occurs *after a prior*

*conviction under this subsection has become final*."  Pub. L. 115-391 § 403(a), 132 Stat. at

5221-22, codified at 18 U.S.C. § 924(c)(1)(C) (emphasis added).  Although Congress did not

make this amendment retroactive, some courts have recognized that sentencing disparities based

on the stacking provision, along with other circumstances such as exemplary rehabilitation and COVID-19, may present extraordinary and compelling reasons to warrant a sentence reduction under 18 U.S.C. § 3582(c).  *See, e.g.*, *United States v. Quinn*, No. 91CR00608DLJ1RS, 2020 WL 3275736, at *4 (N.D. Cal. June 17, 2020); *United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *8-*9 (S.D. Iowa Apr. 29, 2020); *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *15 (E.D.N.Y. Apr. 22, 2020); *U.S.A. v. Defendant(s)*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906, at *5-*6 (C.D. Cal. Apr. 13, 2020).

In the case at bar, the stacking of § 924(c) offenses does not create extraordinary and compelling circumstances warranting a sentence reduction given the nature and characteristics of the offense of conviction and would be inappropriate in light of the other § 3553(a) factors. Furthermore, even had Congress retroactively modified the "stacking" provision, Ford would still have been sentenced to a term of imprisonment substantially longer than the 18 months he has served to date.  *See Brown*, 411 F. Supp. 3d at 453 (court denied compassionate release request regarding removal of the stacking provision because the inmate had not been in prison long enough to serve a substantial portion of what his reduced sentence would have been under the amended statute).  Thus, granting Ford compassionate release after he has served such a small fraction of his sentence, as well as a minimal portion of what his sentence would have been under a hypothetically amended statute, fails to promote respect for the law and does not provide just punishment.

In short, Ford has failed to satisfy his burden of showing the necessary circumstances to warrant relief under the statutory framework to which the court must adhere.

III.     <u>Conclusion</u>

Consistent with the foregoing analysis, Ford's Motion for Reduction in Sentence Pursuant

to 18 U.S.C. § 3582(c)(1)(A)(i) (#146) is DENIED.

SIGNED at Tyler, Texas, this 27th day of August, 2020.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

16